LEASEWAY DISTRIBUTION CENTERS, INC., APPELLEE, *v.* DEPARTMENT OF ADMINISTRATIVE SERVICES ET AL., APPELLANTS.
(THREE CASES.)

100

(Nos. 88AP-330, 88AP-332 and 88AP-370—Decided June 16, 1988.)

*Benesch, Friedlander, Coplan & Aronoff, Joel Mirman, Robert N. Shamansky* and *Thomas E. Berry,* for appellee Leaseway Distribution Centers, Inc.

*Anthony J. Celebrezze, Jr.,* attorney general, *Thomas L. Rosenberg* and *Nathan Gordon,* for appellant Department of Administrative Services.

*Smith & Schnacke, William Wilkinson* and *Julie A. Dunwell,* for appellant, Lewis & Michael, Inc.

*Taft, Stettinius & Hollister, Anne Clifton Berry* and *David Johnson,* for appellant, Taylor Distributing, Inc.

McCORMAC, J. Defendants-appellants, Lewis & Michael, Inc., Taylor Distributing, Inc., and the Department of Administrative Services, appeal the trial court's decisions declaring Leaseway Distribution Centers, plaintiff-appellee, the lowest responsive and responsible bidder in a contract bidding and issuing a writ of mandamus and mandatory injunction compelling the Department of Administrative Services to award a contract to Leaseway.

On January 21, 1988, the Department of Administrative Services ("DAS") requested bids for a contract to provide warehouse storage and handling services for the liquor inventory in southwestern Ohio for the Department of Liquor Control ("DLC"). Bids were submitted by Leaseway Distribution Centers, Inc. ("Leaseway"), Lewis & Michael, Inc. ("Lewis & Michael"), Taylor Distributing, Inc. ("Taylor Distributing"), and another company which is not a party to these cases. After reviewing the bids DAS concluded that Leaseway's bid was invalid. Thereafter, DAS announced its intention to award the contract to Lewis & Michael.

Leaseway initiated two lawsuits in response to this action. In one suit, Leaseway sought a declaratory judgment that it submitted a responsive and responsible bid for warehouse facilities and that it be declared the lowest responsive and responsible bidder. Leaseway sought a mandatory injunction requiring the DAS director, DLC, and the DLC director to award the contract for said services to Leaseway and an injunction preventing the contract from being awarded to any other entity.

In a separate action, which was consolidated for trial with the previous lawsuit, Leaseway sought a writ of mandamus requiring DAS, DLC, the director of DAS and the director of DLC to enter into a contract with Leaseway.

The court granted plaintiff's motion for a temporary restraining order prohibiting DAS, the director of DAS, DLC, and the director of DLC from entering into a contract regarding the warehouse facility. The temporary restraining order prevented the parties from taking any further action until the court held a preliminary and permanent injunction hearing.

Lewis & Michael served a counterclaim and a cross-claim re-

questing that plaintiff's complaint be dismissed and that judgment be granted for it.

The trial court, after a hearing, adjudged that Leaseway was the lowest responsive and responsible bidder and granted a writ of mandamus and a mandatory injunction compelling DAS and the DAS director to award and to execute the contract with Leaseway by noon on April 8, 1988. In the court's judgment entry, it said that findings of fact and conclusions of law were incorporated therein, but it did not say what they were.

On April 8, 1988, the state of Ohio through its defendants-appellants filed a motion for a stay of judgment. The trial court denied this motion for a stay. On the same day, these defendants and defendant-appellant, Lewis & Michael, filed their notices of appeal in the trial court. Taylor Distributing also appealed the trial court's decision at a later time. Each appellant was assigned a different case number, but the cases were subsequently consolidated.

The state's defendants-appellants moved this court for a stay of judgment and, on April 13, 1988, this court granted the motion to stay the trial court's decision.

On April 28, 1988, the trial court issued a *nunc pro tunc* entry in which it stated that it had adopted the findings of fact and conclusions of law submitted by Leaseway and that these were adopted by reference in its earlier April 7 journal entry.

Appellant Lewis & Michael made a motion for leave to strike the *nunc pro tunc* entry of the trial court. This court determined that this motion should be determined when it decides the merits of the consolidated cases.

The state of Ohio, through its defendants-appellants, asserts the following assignments of error:

"1. The trial court erred as a matter of law in not applying the appropriate standard of review of a decision made by an administrative agency statutorily charged with the discretion to make such decisions. The standard for review is not for the trial court to simply substitute its judgment for that of the administrative agency but to determine whether the administrative agency specifically authorized to make such discretionary decisions has abused that discretion granted to it. The trial court did not find such an abuse of discretion.

"2. The trial court erred as a matter of law in finding that Appellee Leaseway's bid could form an offer upon which a contract could be made.

"3. The trial court erred as a matter of law in not determining whether the balance of equities and public interest favors for or against the issuance of injunctive relief and even if such a determination was made, the trial court erred in determining them against the State Appellants."

Defendant-appellant, Taylor Distributing, asserts the following assignment of error:

"The trial court erred in ordering the Department of Administrative Services to award the contract to Plaintiff-Appellant because the bid submitted by Plaintiff-Appellant was not responsive to the bid specifications, as is required by § 125.11 and § 9.312 of the Ohio Revised Code."

Defendant-appellant, Lewis & Michael, states the following assignments of error:

"I. The trial court erred in holding that the State defendants abused their discretion and their clear legal duty by disqualifying a bid which gave that bidder a competitive advantage over other bidders, since Ohio law requires that such a bid be disqualified as nonresponsive.

"II. The trial court erred in issuing an injunction and mandamus order

to Leaseway when Leaseway has an adequate remedy at law for money damages since it is able to calculate the amount of profit it will lose as a result of not being awarded the contract.

"III. The trial court erred in failing to issue a writ of mandamus in favor of Lewis & Michael, commanding the State defendants to enter into the subject contract with Lewis & Michael."

In January 1988, DAS requested bids to provide administrative accounting, inventory control, warehouse handling, and storage services for DLC in southwestern Ohio. Four bidders responded to the request on an Invitation To Bid ("ITB") form.

A significant component of the bid package for purposes of these cases is the area on the cover page of the bid. On the bottom portion of this page, the bid says, "[i]n compliance with the above invitation and subject to all conditions imposed, the undersigned offers, and agrees, to furnish any and all of the items at the price set * * *." There is a space underneath this for an authorized signature and a printed signature. At the bottom of the page, it says in italics **"NO BID WILL BE CONSIDERED IF IT IS NOT SIGNED"** and a revised form says **"No Bid Will Be Considered For Evaluation And/Or Award Unless Authorized Signatures Provided."**

In addition, page A-1 of the bid package says that "the _____ whose address is _____ hereby submits the following proposal for supplying of storage space and service to the State of Ohio, Department of Liquor Control * * *." Page A-3 recites that the people who have signed certify that they have read the ITB and that the facts and statements submitted are true to the best of their knowledge.

Leaseway submitted its bid package, but did not sign the cover page. However, it did complete the rest of the bid package and two Leaseway representatives signed page A-3 of the bid with notarized signatures.

Leaseway sent this bid with a signed letter of transmittal in which it stated it was submitting its proposal for the "handling, storage and other services related to the liquor contract for the state's southwestern district."

Leaseway also enclosed all documents requested by DAS, including financial disclosure documents, a corporate resolution specifically authorizing submission of its proposal, and a $200,000 bid bond. The bid bond, signed by both the surety and by Leaseway, provides that if the state accepts Leaseway's bid and Leaseway fails to enter into a contract in accordance with the bid, the surety is liable for damages.

Four companies submitted responses to the bids. Leaseway submitted the lowest bid, $2,688,250.22, while Lewis & Michael made the next lowest bid at $2,875,374.21. Taylor Distributing was the highest bidder.

The DAS director found that Leaseway's bid was invalid because of Leaseway's lack of signature on the cover page. Thereafter, DAS decided to award the contract to Lewis & Michael. However, the lower court reversed this decision and found that DAS should have awarded the bid to Leaseway.

DAS, Lewis & Michael, and Taylor Distributing appeal this decision. Each asserted its own assignments of error.

DAS' first assignment of error and Lewis & Michael's first assignment of error are considered together. The issue is whether the trial court applied the correct standard of review to the administrative agency's decision. DAS argues that a trial court can overturn an agency's decision to reject a bid only if the agency abused its discretion. *State, ex rel. Executone of Northwest*

*Ohio, Inc.,* v. *Commrs. of Lucas Cty.* (1984), 12 Ohio St. 3d 60, 61, 12 OBR 51, 53, 465 N.E. 2d 416, 417. "Abuse of discretion" is defined as arbitrary, unreasonable, or unconscionable acts. *Dayton, ex rel. Scandrick,* v. *McGee* (1981), 67 Ohio St. 2d 356, 21 O.O. 3d 225, 423 N.E. 2d 1095.

However, discretion of an agency is not unlimited, but it is limited by statute. R.C. 125.11(A) requires that contracts shall be awarded to the lowest responsive and responsible bidder on each item in accordance with R.C. 9.312.

R.C. 9.312, effective January 1, 1988, provides that:

"(A) If a state agency is required by law to award a contract to the lowest responsive and responsible bidder, a bidder on the contract shall be considered responsive if his proposal responds to bid specifications in all material respects and contains no irregularities or deviations from the specifications which would affect the amount of the bid or otherwise give him a competitive advantage. * * *"

Further, the Ohio Administrative Code expressly provides for correction of a bid because of a nonjudgmental mistake. "Bid correction * * * by reason of a nonjudgmental mistake is permissible but only to the extent it is not contrary to the interests of the state or the fair treatment of other bidders." Ohio Adm. Code 123:5-1-22(A).

Additionally, "[w]hen the state purchasing administrator knows or has reason to conclude that a mistake has been made, such administrator should request the bidder to confirm the bid. * * *" Ohio Adm. Code 123:5-1-22(C).

Nevertheless, Ohio Adm. Code 123:5-1-13(A) states that "[t]he invitation to bid shall include space in which the bid price(s) shall be inserted and a space in which the bidder shall sign the bid. * * *" R.C. 125.02 also states that "[t]he department of administrative services shall prescribe uniform rules governing forms of specifications, advertisements for proposals, the opening of bids, the making of awards and contracts, and the purchase of supplies and performance of work."

Although an agency has broad discretion to grant bids based on rules it has established, the legislature has declared that an agency must award its bid to the lowest "responsive and responsible bidder" as defined in R.C. 9.312.

DAS argues that the standard of review of an agency action is abuse of discretion. It states that it did not abuse its discretion when it rejected the bid of Leaseway because the ITB form was not signed on the first page on the line for authorized signatures. On the front page, in bold print, the bid states that **"NO BID WILL BE CONSIDERED IF IT IS NOT SIGNED."** It is important to note that it does not state where the bid should be signed.

DAS argues that, since Leaseway did not comply with its procedures by signing the bid on the front page, DAS acted within its discretion when it rejected the bid. It argues that it is very important that it have firm procedures that are followed because it must review many bids. It states that it needs specific rules to ensure that once the agency decides to grant the bid the successful bidder will not be able to get out of its contract by claiming that its bid was not valid because it was not properly signed. However, the discretion accorded DAS is limited by the provisions of R.C. 9.312.

As stated previously, R.C. 9.312 defines a "responsive bidder" as one whose (1) proposal responds to bid specifications in all material respects, and (2) contains no irregularities or deviations from the specifications which would affect the amount of the

bid or otherwise give him a competitive advantage.

Lewis & Michael applies R.C. 9.312 to Leaseway's bid and concludes that Leaseway was a nonresponsive bidder. It argues that Leaseway's unsigned bid is a deviation from specifications which gave it a competitive advantage over other bidders. Therefore, it argues that DAS did not err when it granted the bid to Lewis & Michael as the lowest responsive and responsible bidder. Lewis & Michael and DAS both argue that the addendum was not part of the bid and that, since only the addendum was signed, the bid was unsigned.

The addendum is part of the bid. DAS conceded that the addendum was part of the bid package to which it expected the bidder to be bound. Pages one through nine of the bid are forms printed and typed with places to fill in the blanks. Pages A-1 through A-3 are also printed forms with blank spaces. Pages one through nine ask very general questions about the bidder, such as whether it is an Ohio company and its cost estimates. The addendum is more specific and requests information about the location of the warehouse, the size of the warehouse, the people in charge, work hours, and insurance coverage.

On page A-3, there are two notarized signatures of representatives of Leaseway. They note that "they have read the Invitation to Bid, of which this *Proposal is a part.*" (Emphasis added.)

Since the cover page of the ITB requires that the bid must be signed, does not state where it must be signed, and the addendum is a part of the ITB, Leaseway's signature on the addendum is sufficient as the bid signature.

As a signed bidder, Leaseway was bound by its bid and, therefore, did not have a competitive advantage against other bidders.

For these reasons, Leaseway's bid complies with R.C. 9.312. Its proposal responds to bid specifications in all material aspects and it contains no irregularities or deviations which would affect the amount of the bid or give the bidder a competitive advantage.

Therefore, DAS abused its discretion in rejecting Leaseway's bid because its discretion was limited by the provisions of R.C. 125.11 and 9.312. It was arbitrary and unreasonable to find that Leaseway had failed to comply with these provisions. Hence, the trial court did not err when it awarded the contract to Leaseway as the lowest and best bidder.

The first assignment of error of DAS and the first part of Lewis & Michael's assignment of error are overruled.

DAS' second assignment of error and division A of Lewis & Michael's first assignment of error are considered together because the issues are the same.

Basically, they argue that the trial court erred as a matter of law in finding that Leaseway's bid was an offer upon which a contract could be made.

DAS cites two out-of-state cases for the proposition that Leaseway's bid was not an offer. One of the cases cited found that a bid was not valid because it was not signed. *A.A.B. Electric, Inc.* v. *Stevenson Pub. School Dist.* (1971), 5 Wash. App. 887, 491 P. 2d 684. It addressed the issue of whether the failure to sign a bid was a defect that could be waived as a mere technicality. However, Leaseway signed the bid and was bound thereon as previously decided. Hence, the case is distinguishable.

The main case cited by DAS has been vacated by the Illinois Supreme Court because the court found the question was moot. It vacated the case without expressing any view on the merits of the trial court's actions. See

*George W. Kennedy Constr.* v. *Chicago* (1986), 112 Ill. 2d 70, 96 Ill. Dec. 700, 491 N.E. 2d 1160. Therefore, appellants' reliance on this case is also without merit.

Generally, an "offer" is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement of the Law 2d, Contracts (1981) 71, Section 24.

In *Retterer* v. *Bender* (1958), 106 Ohio App. 369, 7 O.O. 2d 105, 154 N.E. 2d 827, the court stated that the words used by parties in negotiating for a contract derive their primary importance from the standpoint of whether they serve to express and to achieve mutual assent rather than whether they constitute an apparent expression of an offer or acceptance.

DAS argues that, since Leaseway did not sign its name at the proper place on the cover page, it did not make an offer. The cover page says that "[i]n compliance with the above invitation and subject to all conditions imposed, the undersigned offers, and agrees, to furnish any and all of the items at the price set opposite * * *."

The failure of Leaseway to sign the cover page does not mean that Leaseway's bid was not an offer according to the Restatement and *Retterer*. Rather, what must be looked at is whether a reasonable person would necessarily assume that Leaseway's bid expressed a willingness to enter into a contract. If so, it was an offer.

After reviewing the bid package of Leaseway, its transmittal letter, and its certified resolutions of its board of directors, we conclude that a reasonable person would necessarily assume that the bid was an offer to enter into a contract.

DAS' second assignment of error and Lewis & Michael's division A of its first assignment of error are overruled.

In the second part of Lewis & Michael's first assignment of error, it argues that there is sufficient authority to support the state's decision to disqualify Leaseway's bid.

Lewis & Michael cites a Court of Claims case, *B.S. Contractors, Inc.* v. *Ohio State University* (Mar. 20, 1987), No. 86-13564, unreported, in which the court affirmed an Ohio State University Architect Office's conclusion that the plaintiff's bid must be rejected because the plaintiff failed to complete an EEO certification clause on the bid envelope. The court reasoned that this provision was clear and unambiguous in the bid materials. It also reasoned that the Court of Claims lacked jurisdiction to interfere with a judgment of a state agency.

This case is distinguishable. DAS' requirement that a bidder must sign the bid on the first page is not clear and unambiguous herein and Leaseway's signature affirmed its willingness to be bound by all of the contract. Therefore, the Court of Claims case is not applicable and does not support the state's decision to disqualify Leaseway's bid.

Lewis & Michael also cites federal and out-of-state cases. In each of the cases cited, the bid was not signed and the courts found that the bids were invalid because they undermined the competitive bidding process because, without a signature, the bidder might not be bound by its bid.

However, in our cases, although the first page of the bid is not signed, the addendum of the bid has two notarized signatures on it. As noted previously, these signatures are sufficient to bind the bidder to this bid.

Therefore, division B of Lewis & Michael's first assignment of error is overruled.

Lewis & Michael's first assignment of error is overruled.

In its third assignment of error, DAS argues that the trial court erred as a matter of law in not determining whether the balance of equities and the public interest favor issuing injunctive relief. Additionally, it argues that, even if the trial court balanced the equities and considered the public interest, it erred in deciding against appellants.

An injunction should not be granted when the damage is trifling, fanciful, sentimental, or a mere inconvenience. Particular caution should be exercised in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or to control the action of another department of government. *White* v. *Long* (1967), 12 Ohio App. 2d 136, 41 O.O. 2d 200, 231 N.E. 2d 337.

Appellants argue that public interest strongly favors denying Leaseway's claim for injunctive relief in order to uphold competitive bidding. Although we appreciate DAS' desire to have strict procedures to be followed in the bidding process, we believe that rejecting an otherwise properly signed bid because of the absence of a signature on the first page of the bid when the instructions are somewhat ambiguous and there is no opportunity to supply the missing signature, does not undermine the competitive bidding process.

The public interest in competitive bidding was not undermined when the trial court enjoined DAS from awarding the contract to Lewis & Michael since Leaseway's bid was valid and was "the lowest responsive and responsible bid."

DAS' third assignment of error is overruled.

In Lewis & Michael's second assignment of error, it argues that the trial court erred in issuing an injunction and writ of mandamus in favor of Leaseway. It argues that Leaseway has an adequate remedy at law for money damages because it is able to calculate the amount of profit it will lose as a result of not being awarded the contract.

Neither an injunction nor a writ of mandamus can be issued when there is an adequate remedy at law. *Oberhaus* v. *Alexander* (1971), 28 Ohio App. 2d 60, 57 O.O. 2d 107, 274 N.E. 2d 771.

"For a remedy at law to be adequate, the remedy should be complete in its nature, beneficial and speedy." *State, ex rel. Liberty Mills, Inc.,* v. *Locker* (1986), 22 Ohio St. 3d 102, 104, 22 OBR 136, 137, 488 N.E. 2d 883, 885-886, citing with approval *State, ex rel. Merydith Constr. Co.,* v. *Dean* (1916), 95 Ohio St. 108, 123, 116 N.E. 37, 41. The question is whether the remedy is adequate under the circumstances. *Liberty Mills, supra.*

The trial court concluded that Leaseway did not have an adequate remedy at law. This conclusion was based on its finding of fact number 18, that the profit projections are "subject to many variables which cannot be accurately qualified and which would affect profitability."

The contract provides for a two-year option which can only be exercised by the state. Thus, one cannot calculate the length of the contract. Additionally, one cannot calculate the revenues of the warehouse since DLC controls the volume of the merchandise stored in the warehouse which determines the revenue and, hence, the warehouse's profits.

Further, one of Leaseway's purposes for bidding on the contract was to establish a business presence in Cincinnati so it could secure other warehouse accounts at this warehouse facility. There is no way to calculate

the profit of this additional business since it is speculative.

All of these factors show that it would be difficult to calculate with reasonable certainty the money damages.

Lewis & Michael argues that, if Leaseway was able to compute a bid with reasonable certainty, it should be held to the same standard in calculating its profit. However, as can be seen, calculating Leaseway's profit is not a simple exercise in arithmetic but must take into consideration certain variables which cannot be readily calculated.

Lewis & Michael also argues that recent decisions from the Court of Common Pleas of Franklin County and this court have concluded that unsuccessful bidders in competitive bidding contracts with the state of Ohio have an adequate remedy at law for money damages.

While the court of common pleas in *State, ex rel. Polaroid Corp., v. Denihan* (July 31, 1986), Franklin Cty. C.P. 86CV-05-3398, unreported, concluded that the unsuccessful bidder in the particular bidding context had sustained "measurable damages," we did not address this issue because we found that the plaintiff's bid did not comply with bid specifications and, thus, plaintiff was not entitled to any relief. *State, ex rel. Polaroid Corp., v. Denihan* (1986), 34 Ohio App. 3d 204, 517 N.E. 2d 1021. Additionally, the *Polaroid* case involved a fixed price contract in which the profit could be accurately determined from the contract. The contract at issue herein deals with warehousing where the revenue depends on the volume of goods that goes through the warehouse and, thus, cannot be as accurately calculated.

The trial court did not err in finding that an injunction and a writ of mandamus could be issued and that money damages was an inadequate remedy.

Lewis & Michael's second assignment of error is overruled.

In Lewis & Michael's third assignment of error, it argues that the trial court erred in failing to issue a writ of mandamus in favor of Lewis & Michael, commanding DAS to enter into a contract with Lewis & Michael.

Since Leaseway's bid was valid, the trial court did not err when it refused to issue a writ of mandamus commanding DAS to enter into the contract with Lewis & Michael.

Lewis & Michael's third assignment of error is overruled.

Taylor Distributing, in its first assignment of error, argues that the trial court erred in ordering DAS to award the contract to Leaseway because the bid submitted by Leaseway was not responsive to the bid specifications as required by R.C. 125.11 and 9.312.

As previously stated, these two statutes, in essence, state that a state agency should award a bid to the "lowest responsive and responsible bidder." It defines "responsive" as a bidder whose bid does not have any material defects or irregularities that give the bidder a competitive advantage or affects the amount of the bid.

The ITB in this case required that the warehouse must meet certain size requirements which were specified in Items 2.2.5., 2.2.16 and 2.2.17. The most important requirement was that the warehouse must provide approximately one hundred to one hundred and twenty thousand square feet for storage and liquor and paper bag inventory. Additionally, the bid required additional space for a warehouse sales outlet and sufficient space for the Department of Liquor Control's trucking contractor.

Taylor Distributing argues that Leaseway's proposal included only

eighty-one thousand seven hundred square feet of warehouse space and about sixteen thousand square feet of office space on a mezzanine level.

Since Taylor Distributing did not appear before the trial court and raise this issue, the evidence in the record is unclear about the size of Leaseway's warehouse.

According to Leaseway's bid on page A-2, it says that the maximum space available for storage of liquor and paper bags is one hundred and fifty thousand square feet. In its brief, Leaseway argues that the figures relied on by Taylor distributing were from the September bid package, which included a different warehouse facility than the warehouse included in the present bid. Additionally, the bid specification only estimated that the warehouse facility should be *approximately* one hundred thousand to one hundred and twenty thousand square feet. Lastly, the Department of Liquor Control committee determined that Leaseway's warehouse provided an "excellent location * * * which could readily meet all physical requirements * * * as specified in the ITB."

Taylor Distributing has failed to prove that the bid submitted by Leaseway was not responsive to the bid specifications. Therefore, the trial court did not err in ordering DAS to award the contract to Leaseway.

Taylor Distributing's only assignment of error is overruled.

Lewis & Michael made a motion for leave to strike the *nunc pro tunc* entry of the trial court entered on April 28, 1988. This court determined that it would address the merits of this motion when it addressed the merits of these appeals. Additionally, DAS argued in its reply brief that the *nunc pro tunc* entry issued by the trial judge after appellants had submitted their briefs to the court of appeals caused great harm to appellants.

App. R. 9(E) provides a procedure for correction and modification of the record. It states that, if anything material to either party is omitted from the record by error or accident or is misstated therein, the trial court may, either before or after the record is transmitted to the court of appeals, direct that the omission or misstatement be corrected.

The entry in this case was certified and transmitted to the court of appeals as the record on appeal pursuant to this rule of procedure.

Ohio case law does not allow a *nunc pro tunc* entry to modify an earlier judgment entry. *McKay* v. *McKay* (1985), 24 Ohio App. 3d 74, 24 OBR 129, 493 N.E. 2d 317. The power to enter a judgment *nunc pro tunc* is restricted to placing in the record evidence of judicial action which has actually been taken. *State, ex rel. Phillips,* v. *Indus. Comm.* (1927), 116 Ohio St. 261, 155 N.E. 798. It can only be exercised to supply an omission in the exercise of functions which are merely clerical. *Jacks* v. *Adamson* (1897), 56 Ohio St. 397, 47 N.E. 48. It is not made to show what the court might or should have decided, or intended to decide, but what it actually did decide. *Webb* v. *Western Reserve Bond & Share Co.* (1926), 115 Ohio St. 247, 153 N.E. 289.

In the initial judgment entry the court said:

"* * * The Court, being fully advised and for the reasons set forth in its findings of fact and conclusions of law entered in this matter, * * * finds that plaintiff is entitled to the relief sought, and it is:

"ORDERED that plaintiff Leaseway Distribution Centers, Inc. is hereby declared the lowest responsive and responsible bidder * * *."

However, the trial court failed to include its findings of fact or conclusions of law with this judgment.

By the April 28, 1988 *nunc pro tunc* entry, the trial court clarified the findings of fact and conclusions of law adopted in its April 7, 1988 journal entry. It stated that it adopted Leaseway's proposed findings of facts and conclusions of law, which had been submitted, along with those of the other parties' at the request of the court, prior to its initial judgment entry.

Appellants argue that the trial court was divested of jurisdiction over these cases when appellants filed their notices of appeal with this court on April 27, 1988. However, a *nunc pro tunc* entry may be entered long after a record has been made, correcting the original entry so that it shall conform to the actual order or judgment of the court. The order or judgment must have been, in fact, made and in no case should a correction be added to the record if it is not properly a part thereof. *Toledo* v. *Preston* (1893), 50 Ohio St. 361, 34 N.E. 353. Additionally, App. R. 9(E) allows a trial court, after a record is transmitted to the court of appeals, to correct or modify its record.

Therefore, the trial court had authority to issue the *nunc pro tunc* entry after appellants filed their notices of appeal with this court.

Lewis & Michael also argues that it was greatly prejudiced because the *nunc pro tunc* entry was issued after its appellate brief had been filed. Although it does not say why, we assume that appellants meant that the trial court's findings of fact and conclusions of law made the cases against appellants stronger without appellants having an opportunity to respond adequately.

However, even without the court's findings of fact and conclusions of law, we find that there is sufficient evidence that DAS did not comply with R.C. 9.312 when it invalidated Leaseway's bid. Thus, there is sufficient evidence in the record supporting the trial court's decision to grant the bid to Leaseway even without its more detailed findings of fact and conclusions of law.

Therefore, Lewis & Michael was not prejudiced by the timing of the *nunc pro tunc* entry.

After reviewing the trial court's initial judgment entry with its references to findings of fact and conclusions of law, its request that all the parties submit findings of fact and conclusions of law, and its decisions in favor of Leaseway, we conclude that the trial court accepted Leaseway's findings of fact and conclusions of law initially, but had clerically omitted supplying it. It is well-settled that a *nunc pro tunc* entry is valid if it shows what the court did even though its action did not previously appear in the record.

The *nunc pro tunc* entry is valid and Lewis & Michael's motion to strike is overruled.

All assignments of error are overruled. Lewis & Michael's motion to strike the *nunc pro tunc* entry is also overruled. The judgments of the trial court are affirmed.

*Motion to strike overruled; judgments affirmed.*

REILLY and YOUNG, JJ., concur.