FORD, Appellee,

v.

TANDY TRANSPORTATION, INC., Appellant.

[Cite as *Ford v. Tandy Transp., Inc.* (1993), 86 Ohio App.3d 364.]

Court of Appeals of Ohio,
Lawrence County.

No. 91CA31.

Decided Feb. 16, 1993.

368

*David Reid Dillon* and *Ralph T. McDermott* for appellee.

*Allen & Payne* and *Craig A. Allen* for appellant.

HARSHA, Judge.

Tandy Transportation, Inc. ("Tandy"), defendant-appellant, appeals from a judgment entered upon a jury verdict by the Lawrence County Court of Common Pleas awarding Oakie Ford, plaintiff-appellee, $40,800 on his breach of contract

claim against Tandy. The trial court further ordered Tandy to pay Ford prejudgment interest.

Appellant assigns the following errors:

"1. The trial court erred in overruling Tandy's motion to dismiss on the ground that the court has no jurisdiction over the subject matter of the case because this case involves commissions or fees on interstate shipments of goods, which requires the interpretation of federal statutes over which the Interstate Commerce Commission and the federal courts have exclusive jurisdiction.

"2. The trial court erred in overruling defendant Tandy's motion to dismiss for lack of jurisdiction on the ground that the suit concerns the business of interstate commerce which is within the exclusive jurisdiction of the federal courts and the Interstate Commerce Commerce [*sic*].

"3. The trial court erred in overruling motion to dismiss for failure to state a claim on ground that Ford is not a licensed broker and; [*sic*] therefore, has no claim for broker's fees.

"4. The trial court erred in overruling defendant Tandy Transportation's motion for directed verdict because there is no evidence of a manifestation of mutual assent, i.e., a meeting of the minds between the parties, an essential element of a contract.

"5. The trial court erred in failing to rule on defendant Tandy Transportation's motion for judgment non obstante veredicto because there is no evidence of a manifestation of mutual assent, i.e. a meeting of the minds between the parties, an essential element of a contract.

"6. The trial court erred in failing to rule on defendant Tandy Transportation's motion for judgment non obstante veredicto because there is no evidence of acceptance, an essential element of a contract.

"7. The trial court erred in overruling defendant Tandy Transportation's motion for directed verdict on the ground there is no evidence of acceptance of an offer, an essential element of a contract.

"8. The trial court erred in overruling defendant, Tandy Transportation's motion for judgment non obstante veredicto on the ground that plaintiff failed to prove the existence of a valid contract between the paties [*sic*] because the evidence conclusively establishes that one of the parties to the purported contract was acting under a mistaken belief as to a material term of the contract.

"9. The trial court erred in overruling defendant, Tandy Transportation's motion for directed verdict because the evidence conclusively establishes that Ford did not have a customer as stated in the letter.

"10. The trial court erred in failing to rule on defendant Tandy Transportation's motion for judgment non obstante veredicto because there is no evidence of a return promise or [*sic*] performance, i.e., consideration, a required element of a contract.

"11. The trial court erred in overruling defendant Tandy Transportation's motion for directed verdict because enforcement of the contract is barred by the statute of frauds.

"12. The trial court erred in failing to rule on defendant Tandy Transportation's motion for new trial on the ground that the evidence is insufficient to support the jury's finding that there was a manifestation of mutual assent between the parties, i.e., a meeting of the minds.

"13. The trial court erred in granting Ford's motion for prejudgment interest because the amount sought by Ford against Tandy Transportation is unliquidated."

On August 30, 1989, Oakie Ford filed a complaint, which alleged that Tandy had breached an agreement to pay Ford a $200 per load commission for his efforts in helping Tandy obtain a trucking contract with Republic Systems Corporation ("Republic"). Ford's complaint requested an accounting to determine the number of loads which Tandy had hauled for Republic, a judgment in an amount equal to $200 times the number of loads, and prejudgment interest. Tandy filed motions to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief can be granted. A referee recommended that Ford's complaint be dismissed for lack of subject matter jurisdiction because it was "necessary to interpret Federal Statutes" to determine Ford's status under the Interstate Commerce Act. However, the trial court subsequently sustained Ford's objections to the referee's report and overruled Tandy's dismissal motions. Tandy never filed an answer to the complaint.

The matter proceeded to a jury trial and produced the following evidence. Ford testified that he had been involved in the trucking and transportation business for approximately forty-five years. Beginning in 1976, Ford operated a company called Beattyville Transport, Inc. For several years up to 1986, Beattyville transported a product from a Dow Chemical plant in Hanging Rock, Ohio to a Republic plant in Dallas, Texas. During this time, Beattyville charged Republic $1,450 per load to transport the material to Dallas. In early 1986, Republic terminated its business relationship with Ford and Beattyville and awarded the trucking contract to a competitor.

In August 1986, Ford read Tandy's advertisement in a trucking industry trade newspaper named "Transport Topics." This stated that Tandy, an Interstate

Commerce Commission common contract carrier, needed van trailer loads from all points within the country to the Dallas area. It advised interested parties to contact Willard A. "Buddy" Hartman, a sales representative for Tandy, by telephone. Ford contacted Hartman and, without giving all of the specific details regarding names, advised Hartman generally of the Ohio to Dallas route. Ford neither told nor represented to Hartman that Republic was still his customer, instead specifically advising Hartman that he had handled the route previously, but no longer had an employment relationship with the prospective customer. Ford additionally told Hartman that the price he had charged for the route prior to being terminated was $1,450, but further advised Hartman that he probably would have to discount that figure. Ford stated to Hartman that he could handle the situation any way Tandy wanted, *i.e.,* as a broker, sales agent, etc., and requested that Hartman send him a letter following up on their conversation.

On September 12, 1986, Hartman sent Ford a letter which provided:

"Thank you for taking time to respond to our ad in Transportation Topics. During our conversation, you stated that you had a customer requiring weekly service from Ironton, OH to Dallas, TX.

"The merchandise would be picked up either on Thursday or Friday and would need to be delivered in Dallas, TX each Monday morning at 6:30 AM. The goods (foam, weighing approx. 7,000 lbs.) would be unloaded and taken to a designated area in the consignee's facility, by our driver. We understand that this may require an empty trailer be left at the shipper's dock each week.

"We would be able to perform the service outlined above for the gross amount you quoted of $1,450. We will pay you $200 per load as your fee. As discussed, we would move this on our Authority. Freight charges would be collected and we would bill the consignee in Dallas, TX. Again, we would like to thank you for calling and we look forward to working with you."

Following receipt of this letter, Ford had further conversations with both Hartman and Republic's Dallas site manager, Larry Adams. Ford understood that Tandy wanted him to merely set up the relationship between Tandy and Republic, but not to act as either broker or sales agent. In his further conversations with Hartman, Ford agreed to a deal with Tandy. Ford's agreed reimbursement of $200 per load was not contingent on Tandy securing a fee of $1,450 from Republic. Ford repeatedly advised Tandy that the $1,450 figure was merely a starting point for negotiations between Tandy and Republic. Hartman never indicated to Ford that the agreed $200 per load fee was dependent on Ford having a business relationship with Republic. Hartman was only concerned with whether Ford could provide information that would result in Tandy obtaining Republic's Ohio to Dallas truck route.

In November or December 1986, at Hartman's request, Ford continued to telephone both Hartman and Adams in an attempt to get Tandy and Republic to make a deal. Republic was soliciting bids for the route and Adams told Ford what they were looking for as far as companies to haul the foam product from Hanging Rock, Ohio to Dallas. Ford then telephoned Hartman and told him that if Tandy placed a bid of $1,100, it would get the Republic job. Tandy was then contacted by Republic to bid on the route. According to Ford, the only reason Republic solicited a bid from Tandy was because of Ford's contact with Adams. In January 1987, Tandy bid $1,100 for the job and was successful in acquiring the route. Tandy did not advise Ford of its successful bid.

Ford subsequently discovered that Tandy had acquired the Republic route and requested compensation pursuant to the parties' agreement. Tandy eventually transported two hundred four loads, but refused to pay Ford any amount. Ford testified that he was entitled to the $200 fee as long as freight was moved by Tandy from Hanging Rock, Ohio to Dallas.

According to Hartman's testimony, there was never any agreement between the parties because his September 12, 1986 offer was contingent both on Republic being Ford's current customer and on Tandy obtaining the Republic route for the $1,450 per load rate. Hartman testified that Tandy's subsequent successful bid was in no way aided by any information garnered from Ford. However, Hartman additionally testified that at the time he wrote the September 12, 1986 letter, he fully anticipated that Tandy would pay Ford the agreed upon $200 per load fee.

At the conclusion of Ford's evidence, Tandy moved for a directed verdict on the following grounds: (1) the purported contract was unenforceable because of the Statute of Frauds; (2) there was no proof of any contract where there was no meeting of the minds and no acceptance of any offer; and (3) Ford presented no expert testimony. The trial court overruled the motion on the basis that there remained factual issues to be resolved by the jury. Tandy then presented testimonial evidence. Adams testified that Republic solicited bids from several firms, including Tandy, without any contact from Ford regarding the bids. Adams admitted, however, that prior to the bid process, Republic possessed no business relationship whatsoever with Tandy. Robert Mitchell Carroll, the owner of a trucking company, testified that Ford acted neither as an agent nor a broker in the transaction and that if he received a letter similar to that received by Ford from Hartman, he would not expect to receive $200 a load. John Friedman, an attorney who regularly practiced before the Interstate Commerce Commission, also testified that Ford acted neither as an agent nor a broker in the transaction. At the conclusion of the evidence, the trial court overruled Tandy's renewed motion for a directed verdict. The jury returned a verdict in favor of Ford in the

amount of $40,800. The trial court overruled Ford's oral motion for prejudgment interest.

Ford subsequently filed a written motion for prejudgment interest. On December 4, 1991, the trial court filed a final judgment entry in which it incorporated the jury verdict in favor of Ford and additionally granted his motion for prejudgment interest. On December 18, 1991, Tandy filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial on the following grounds: (1) no proof of a valid, binding contract; (2) no evidence of a manifestation of mutual assent or meeting of the minds; (3) no evidence of acceptance of an offer; (4) no evidence of consideration; (5) Ford had no authority to act on behalf of Republic and no capacity to contract with Tandy; and (6) the contract relied upon by Ford was oral and unenforceable under the Statute of Frauds. On December 31, 1991, Tandy filed a notice of appeal from the December 4, 1991 judgment entry. On January 7, 1992, Ford filed a response to Tandy's motion for judgment notwithstanding the verdict or new trial which asserted, in part, that since Tandy had filed a notice of appeal, the trial court lacked jurisdiction to rule on the postjudgment motion. To date, the trial court has not ruled on Tandy's motion.

Appellant Tandy's first and second assignments of error assert that the trial court erred in overruling its motions to dismiss for lack of subject matter jurisdiction. Appellant contends appellee Ford's complaint involved matters within the exclusive jurisdiction of federal courts and the Interstate Commerce Commission, and required interpretation of federal statutes. Appellant's third assignment of error asserts that the trial court erred in overruling its motion to dismiss for failure to state a claim for which relief could be granted, since Ford had no claim for broker's fees. Tandy combines these assignments of error jointly in its brief but fails to separately argue its third assignment of error regarding its Civ.R. 12(B)(6) motion. Accordingly, pursuant to App.R. 12(B)(2), we disregard that assignment of error.

■■■ The standard to apply for a dismissal pursuant to Civ.R. 12(B)(1), lack of subject matter jurisdiction, is whether the plaintiff has alleged any cause of action which the court has authority to decide. *McHenry v. Indus. Comm.* (1990), 68 Ohio App.3d 56, 62, 587 N.E.2d 414, 418; see, also, *Avco Financial Serv. Loan, Inc. v. Hale* (1987), 36 Ohio App.3d 65, 520 N.E.2d 1378. This is generally a question of law which we review independently of the trial court's decision. In determining whether the plaintiff has alleged a cause of action sufficient to withstand a Civ.R. 12(B)(1) motion to dismiss, the trial court is not confined to the allegations of the complaint and it may consider material pertinent to such inquiry without converting the motion into one for summary judgment. *Southgate Dev. Corp. v. Columbia Gas Transm. Corp.* (1976), 48 Ohio

St.2d 211, 2 O.O.3d 393, 358 N.E.2d 526, paragraph one of the syllabus; *McHenry, supra,* 68 Ohio App.3d at 62, 587 N.E.2d at 418.

Nothing in the concept of the federal system prevents state courts from enforcing rights created by federal law. *Catlett v. Catlett* (1988), 55 Ohio App.3d 1, 3, 561 N.E.2d 948, 950, citing *Charles Dowd Box Co. v. Courtney* (1962), 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483; see, also, *Wilson v. Patton* (1988), 49 Ohio App.3d 150, 551 N.E.2d 625 (in the absence of a grant of exclusive jurisdiction, state courts have concurrent authority to adjudicate federally created causes of action). Therefore, state courts can exercise concurrent jurisdiction with federal courts in cases arising under the laws of the United States where it is not excluded by express provision, or by incompatibility in its exercise arising from the nature of the particular case. *Catlett, supra.* Tandy contends that the trial court lacked subject matter jurisdiction over Ford's action since Ford was seeking a broker's fee for arranging the interstate freight contract between Tandy and Republic even though Ford was not properly licensed by the Interstate Commerce Commission to act as a broker. In order to address this issue, appellant claims that the trial court would have to interpret federal law, over which the Interstate Commerce Commission has been given exclusive jurisdiction.

Where primary jurisdiction has been conferred on the Interstate Commerce Commission to deal with interstate commerce to the extent and in the manner provided for by acts of congress, state courts have no jurisdiction to exercise authority over subjects which primarily come within the jurisdiction of the commission. *Cleveland & W. Coal Co. v. Pennsylvania Co.* (1918), 97 Ohio St. 161, 119 N.E. 367, syllabus (claim for demurrage charges filed with Interstate Commerce Commission); *Carlin Co. v. Hines* (1923), 107 Ohio St. 328, 140 N.E. 99 (claim for tariffs filed with Interstate Commerce Commission); see, also, *Selig v. Bd. of Revision* (1967), 12 Ohio App.2d 157, 167, 41 O.O.2d 232, 238, 231 N.E.2d 479, 486. The Interstate Commerce Act expressly provides that its remedies are in addition to remedies existing under another law or at common law. Section 10103, Title 49, U.S.Code. There is no presumption that Congress intended to prevent state courts from exercising jurisdiction which they already possess. *Galveston, H & S.A.R. Co. v. Wallace* (1912), 223 U.S. 481, 32 S.Ct. 205, 56 L.Ed. 516. The Interstate Commerce Act does not supersede the jurisdiction of state courts where there is no determination of matters calling for the exercise of administrative power and discretion of the commission. *Langhill v. Pennsylvania R.R. Co.* (1916), 254 Pa. 119, 98 A. 873; *Buschow Lumber Co. v. Union P.R. Co.* (1925), 220 Mo.App. 743, 276 S.W. 409; *Pecos & N.T.R. Co. v. Porter* (Tex.App.1916), 183 S.W. 98; see, also, *Reed v. Aaacon Auto Transport, Inc.*

(C.A. 10, 1981), 637 F.2d 1302 (Interstate Commerce Act does not preempt all common-law rules applicable to carrier liability).

■ The Interstate Commerce Act defines a "broker" as "a person, *other than a motor carrier or an employee or agent of a motor carrier,* that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." (Emphasis added.) Section 10102(1), Title 49, U.S.Code. In other words, a broker is a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Section 10924(c)(2), Title 49, C.F.R. Ford claimed that since he was president and chief executive officer of Beattyville Transport, Inc. which possessed an Interstate Commerce Commission permit to engage in transportation as a motor carrier, he was not a broker pursuant to Section 10102(1), Title 49, U.S.Code, *i.e.,* he was an agent of a motor carrier.

However, the language of the foregoing statutory provision does not mean that a motor carrier cannot be a broker; indeed, if a motor carrier engages in certain activities, it must obtain a broker's license. *Global Van Lines, Inc., v. Interstate Commerce Comm.* (C.A.5, 1982), 691 F.2d 773, 775. As noted by the *Global Van Lines, Inc.* court at 775, citing Practices of Property Brokers (1949), 49 M.C.C. 277, 292:

"The status of any given person in any particular activity depends upon, and is determined by, what such person does in that respect and not upon what it does, or its status, in some other respect. And the mere possession of carrier status and the holding of a certificate or permit does not relieve a person of the necessity of obtaining a license if in fact such person is engaged in brokerage activities for compensation." See, also, 1 Federal Carriers Rptr. (1987) 2075, Section 25. Since Ford was not attempting to obtain traffic for his own motor carrier, Beattyville, the mere fact that he was an agent employee of Beattyville did not preclude him from falling within the statutory definition of broker. *Global Van Lines, Inc., supra,* at 775. However, this does not necessarily mean that Ford was a broker under the circumstances of this case.

A court may dismiss a complaint for lack of jurisdiction over subject matter on the basis of (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Jenkins v. Eberhart* (1991), 71 Ohio App.3d 351, 355, 594 N.E.2d 29, 31. The record before the trial court at the time it determined Tandy's Civ.R. 12(B)(1) motion to dismiss for lack of subject matter jurisdiction included (1) Ford's complaint, which alleged in part that Ford "began making arrangements to bring together" Tandy and Republic; (2) a copy of the September 12, 1986 letter from Hartman to Ford which was

attached to Ford's complaint stating that Hartman and Tandy "would move this on our authority"; and (3) Ford's October 23, 1989 objections to Tandy's motion to dismiss, in which he stated in a signed and notarized statement:

"Plaintiff did not sell, negotiate for, or hold himself out as a seller, provider, or arranger for transportation by motor carrier for compensation. Plaintiff left each and every one of those details to the two involved parties, Defendant and Republic Systems. In fact, Plaintiff specifically indicated in his telephone calls to Defendant and Republic Systems that he was not in any way acting as a broker. Plaintiff had nothing whatsoever to do with how or where the loads were to be picked up; how or where the loads were to be delivered; under whose authority the goods would be moved; how billing would be sent or collected; nor any other such details. These particulars of the transaction were arranged for between Defendant and Republic Systems, without any input whatsoever from Plaintiff[.]"

(4) an affidavit of Hartman indicating that Ford had nothing to do with the subsequent contract between Tandy and Republic; (5) an affidavit of one of Republic's agents who stated that Ford did not negotiate any business relationship between Tandy and Republic; and (6) Ford's objections to a referee's report and a reply to Tandy's response, stating that Ford "will not claim to be a broker" and "does not, has not, and will not plead or prove this case as one involving the 'brokering of trucking fees,' or as a claim for 'broker's fees.'" Based upon the foregoing, the trial court could have resolved the disputed facts by finding that Ford was not acting as a broker as defined by the Interstate Commerce Act and that his claim was not one for broker's fees as specified in the Act.

In other words, this is not a case where Ford alleged that the action arose under the Interstate Commerce Act, *i.e.,* where it involves a carrier attempting to collect or a consignee attempting to pay charges prescribed by tariff filed with the commission. *Thurston Motor Lines, Inc. v. Rand* (1983), 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260; *Cleveland & W. Coal Co., supra.* Furthermore, the Interstate Commerce Act does not supersede the jurisdiction of state courts where the decision does not involve the determination of the administrative power and discretion of the Interstate Commerce Commission, or relate to a subject as to which the jurisdiction of the federal courts has otherwise been made exclusive. 13 American Jurisprudence 2d (1964) 608, Carriers, Section 57. In this case, there is no indication that the determination of whether Ford was or was not a broker necessarily required the administrative discretion legislatively promulgated to the Interstate Commerce Commission. Cf. *id.* and *Langhill, supra.* Upon a determination that Ford was not a broker, the trial court also possessed subject matter jurisdiction to determine Ford's contract action pursuant to Section 10103, Title 49, U.S.Code. Therefore, we discern no error of law on the part of the trial court in determining that is possessed subject

matter jurisdiction over Ford's complaint and overruling Tandy's dismissal motions. Appellant's first, second, and third assignments of error are overruled.[1]

██ Appellant's fourth, seventh, ninth and eleventh assignments of error assert that the trial court erred in overruling its motion for a directed verdict because (1) there was no evidence of a manifestation of mutual assent, *i.e.*, a meeting of the minds between the parties; (2) there was no evidence of acceptance of an offer; (3) the evidence conclusively establishes that Ford did not have a customer as specified in Tandy's September 12, 1986 letter; and (4) enforcement of any contract between the parties is barred by the Statute of Frauds.

Civ.R. 50(A)(4) provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

██ A motion for a directed verdict presents a question of law, not a question of fact, even though in deciding such a motion it is necessary to review and consider the evidence. *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 31 OBR 250, 255, 509 N.E.2d 399, 404. Accordingly, we again make an independent review. When considering a motion for a directed verdict, a trial court must construe the evidence most strongly in favor of the party against whom the motion is directed. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178, 423 N.E.2d 467, 469. Where there is substantial competent evidence favoring the nonmoving party upon which reasonable minds might reach different conclusions, the motion must be denied. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828, 837. By renewing its motion for a directed verdict made at the conclusion of Ford's case at the conclusion of all the evidence, Tandy has not waived this issue on appeal.

---

1. Tandy relies on some of the trial testimony of Ford in support of its argument on appeal. However, the trial court's ruling came prior to trial. Nevertheless, since lack of subject matter jurisdiction may be raised at any time, see *Wilson, supra,* 49 Ohio App.3d at 152, 551 N.E.2d at 627, Tandy's assertion might be construed as being that after trial, it was apparent that Ford was a broker and, thus, the trial court then lacked subject matter jurisdiction. However, this ignores the trial testimony of Tandy's own two expert witnesses, one being an experienced practitioner before the Interstate Commerce Commission, that based on the evidence, Ford was *not* acting as a broker during the subject transaction. Therefore, Tandy's assertion in this regard is also meritless. Tandy also did not expressly renew its Civ.R. 12(B)(1) motion at trial nor does it specifically claim lack of subject matter jurisdiction at the time of appeal.

*Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 529 N.E.2d 464, paragraph one of the syllabus.

Tandy initially contends that there was no evidence of an enforceable contract where there was no meeting of the minds and no evidence of acceptance. A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty. Restatement of the Law 2d, Contracts (1981) 5, Section 1. In other words, an express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound. *Cuyahoga Cty. Hospitals v. Price* (1989), 64 Ohio App.3d 410, 415, 581 N.E.2d 1125, 1127. In order to declare the existence of a contract, the parties to the contract must consent to its terms, there must be a meeting of the minds of both parties, and the contract must be definite and certain. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134, 137; see, also, *Alligood v. Proctor & Gamble Co.* (1991), 72 Ohio App.3d 309, 594 N.E.2d 668.

Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. Restatement of the Law 2d, Contracts (1981) 53, Section 18. The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act. *Id.* at 55, Section 19(1); see, also, *Terex Corp. v. Grim Welding Co.* (1989), 58 Ohio App.3d 80, 82, 568 N.E.2d 739, 741 (the term "contract" includes every description of agreement or obligation, *whether verbal or written,* whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act). The mutual assent is normally manifested by offer and acceptance. An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. *Leaseway Distrib. Centers, Inc. v. Ohio Dept. of Adm. Serv.* (1988), 49 Ohio App.3d 99, 105, 550 N.E.2d 955, 961. The manifestation of assent by the offeree constitutes the acceptance. 2 Lord, Williston on Contracts (4 Ed.1991) 8–9, Section 6:1.

Based upon Ford's testimony, he agreed to a deal with Hartman, Tandy's representative, in which Tandy offered to pay Ford $200 per load in return for Ford's assistance in securing a transportation contract between Tandy and Republic for the Hanging Rock to Dallas route. Tandy contends that its September 12, 1986 letter did not constitute a contract or an offer that was unqualifiedly accepted. However, Tandy overlooks the fact that the Hartman letter did not have to constitute either the entire contract or the entire offer which Ford verbally accepted. It was sufficient that the offer consisted partly of

representations made in the letter and partly of verbal representations made by Hartman on behalf of Tandy. Restatement of the Law 2d, Contracts (1981) 55, Section 19(1). Ford testified that the letter and conversations with Hartman indicated that the $200 per load fee was not contingent on Tandy securing a fee of $1,450 from Republic or on Ford having a current business relationship with Republic; Hartman was only concerned with Ford providing assistance that would result in Tandy obtaining Republic's Ohio to Dallas truck route. According to Ford's testimony, his efforts led to Tandy's ultimately successful bid. Construing this evidence most strongly in favor of Ford, reasonable minds could conclude that the parties had entered into a binding contract, with the required meeting of the minds manifested by a valid acceptance of Tandy's offer. As noted previously, there was sufficient evidence to indicate that Tandy's offer was not contingent on Ford having Republic as its customer and that despite Hartman's language in his letter, there was no misunderstanding.[2] Therefore, the trial court did not err in overruling either Tandy's motion for directed verdict at the conclusion of Ford's evidence or at the conclusion of all the evidence as to these asserted grounds.

Tandy further contends that it was entitled to a directed verdict on the basis that the alleged contract was unenforceable because it violated the Statute of Frauds. Tandy contends that since the alleged contract was either oral or partially oral in several essential aspects, it violated the Statute of Frauds because it could not be performed within a year.

We initially note that the Statute of Frauds is an affirmative defense which is generally waived if not raised in the pleadings. See, e.g., Houser v. Ohio Historical Soc. (1980), 62 Ohio St.2d 77, 79, 16 O.O.3d 67, 68, 403 N.E.2d 965, 967; Civ.R. 8(C). In this case, Tandy failed to raise this affirmative defense in its answer. In fact, Tandy never filed any answer to Ford's complaint. However, Ford never raised these procedural issues during the proceedings and the trial court proceeded to hear arguments on the Statute of Frauds on the merits. Therefore, it is apparent that this issue was tried by express or implied consent of the parties, and the issue must be treated as if it had been raised in the pleadings. Houser, supra, 62 Ohio St.2d at 79–80, 16 O.O.3d at 68, 403 N.E.2d at 967; Robinson v. McDougal (1988), 62 Ohio App.3d 253, 575 N.E.2d 469; Civ.R. 15(B); 10A Wright, Miller & Kane, Federal Practice and Procedure (1983) 43,

---

**2.** It follows from the general rule that manifested mutual assent rather than actual mental assent is the essential element in the formation of contracts, that a mistaken idea of one or both parties in regard to the making of an offer and acceptance will not generally prevent the formation of a contract. 2 Lord, Williston on Contracts (4 Ed.1991) 682–684, Section 6:57. At any rate, appellee testified that there was no mistake and that both parties understood that Republic was not appellee's customer and that this was not essential to the parties' agreement.

Section 2721; but, cf., *Couto v. Gibson, Inc.* (Feb. 26, 1992), Athens App. No. 1475, unreported, 1992 WL 37800.

R.C. 1335.05 provides:

"No action shall be brought * * * upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized. * * *" See, also, *DeCavitch v. Thomas Steel Strip Corp.* (1990), 66 Ohio App.3d 568, 572, 585 N.E.2d 879, 882.

Assuming, *arguendo,* that Tandy is correct that the parties' contract was oral in essential particulars and that Hartman's letter was an insufficient written memorandum, see *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App.3d 342, 16 OBR 391, 476 N.E.2d 388, we must determine whether the parties' contract could be performed within one year of the date it was entered. A promise which is not likely to be performed within a year, and which in fact is not performed within a year, is still not within the Statute of Frauds if at the time the contract is made, there is a possibility in law and in fact that full performance such as the parties intended may be completed before the expiration of a year. 3 Jaeger, Williston on Contracts (3 Ed.1960) 576–578, Section 495; see, generally, 51 Ohio Jurisprudence 3d (1984) 230–231, Statute of Frauds, Section 76. Simply put, those authorities stand for the proposition that if an agreement may be terminated or completed within a year upon the happening of some contingency, it is not covered by the Statute of Frauds. This principle has been applied to promises in terms of unlimited duration made by or to a corporation when performance is by the nature of the agreement limited to the continuance of its business. See Williston, *supra,* at 582.

At trial, Ford testified that his promised performance under the parties' contract was completed within a year of the contract and that Tandy's continued performance consisted of paying Ford $200 for every load transported by Tandy for Republic from Hanging Rock, Ohio to Dallas. Ford further testified that he was entitled to the $200 per load fee only as long as freight was moved by Tandy on that route and that the agreement would end if Tandy did not run the route again. Adams testified that the previous carrier only had the route for less than a year. There was no evidence as to whether the contract between Republic and Adams was for any specific term. Therefore, at the time the contract was entered into, there was a possibility in law and fact that Tandy's performance might end within one year of the parties' contract. There was no violation of the Statute of Frauds and, therefore, the trial court did not err in overruling Tandy's

motion for a directed verdict on this basis either. Appellant's fourth, seventh, ninth, and eleventh assignments of error are overruled.

Appellant's fifth, sixth, eighth, and tenth assignments of error assert that the trial court erred in failing to rule on its motion for judgment notwithstanding the verdict, which asserted that (1) there was no evidence of a manifestation of mutual assent, *i.e.,* a meeting of the minds between the parties; (2) there was no evidence of acceptance; (3) the evidence conclusively establishes that one of the parties was acting under a mistaken belief as to a material term of the contract; and (4) there was no evidence of consideration.

At the outset, it appears that the trial court accepted Ford's contentions that once Tandy filed its notice of appeal from the December 4, 1991 judgment, the trial court lacked jurisdiction to rule on Tandy's postjudgment motion. Ford relies on *Majnaric v. Majnaric* (1975), 46 Ohio App.2d 157, 75 O.O.2d 250, 347 N.E.2d 552, for this proposition. A trial court retains all jurisdiction not inconsistent with the reviewing court's exercise of its appellate jurisdiction. Whiteside, Ohio Appellate Practice (1987) 49, T 11.01. In *Majnaric,* the Ninth District Court of Appeals held that trial courts were without jurisdiction to grant a motion for new trial under Civ.R. 59 or to vacate, alter or amend the judgment under Civ.R. 60(B) whether the Civ.R. 60(B) motion is made prior to or after the appeal is taken. In *Day v. MacDonald* (1990), 67 Ohio App.3d 240, 244–246, 586 N.E.2d 1135, 1137–1139, this court rejected *Majnaric* insofar as it relates to Civ.R. 60(B) motions for relief from judgment, citing Judge Whiteside's disapproval of *Majnaric.* See Whiteside, *supra,* at 52, T 11.03(E); see, also, *Proctor v. Royal Petroleum* (Mar. 22, 1989), Gallia App. No. 87CA28, unreported, 1989 WL 25726. No Civ.R. 60(B) motion is involved in the case at bar.

In *Powell v. Turner* (1984), 16 Ohio App.3d 404, 16 OBR 474, 476 N.E.2d 368, the Eleventh District Court of Appeals held that motions for new trial, for remittitur and for judgments notwithstanding the verdict are inconsistent with a notice of appeal and a trial court is divested of jurisdiction to decide the merits of these motions once a notice of appeal from the original judgment is filed. The *Powell* court explicitly rejected the argument that the trial court erred in ruling that the filing of the notice of appeal divested that court of jurisdiction to consider the pending motions. Whiteside cites *Powell* with approval, stating that the *Powell* court "properly found that a motion for new trial, a motion for remittitur, and a motion for judgment notwithstanding the verdict are inconsistent with an appeal." Whiteside, *supra,* at 52, T 11.03. Other courts have expressly followed *Powell* and held that notices of appeal divest trial courts of jurisdiction to decide motions for new trial. *Words, Inc. v. Tens Pain Mgt.* (Aug. 10, 1992), Warren App. No. CA92–01–007, unreported, 1992 WL 193659; *Marshall v. Marshall*

(Dec. 19, 1991), Cuyahoga App. Nos. 59669 and 60469, unreported, 1991 WL 271437. These holdings are distinguished from cases involving Civ.R. 60(B), since Civ.R. 60(B) motions for relief from judgment cannot be used as substitutes for appeal and do not extend the time for appeal, whereas Civ.R. 50(B) motions for judgment notwithstanding the verdict and Civ.R. 59 motions for new trial are substitutes for appeal and do extend appeal time. Accordingly, based on *Powell, Words, Inc., Marshall,* and Whiteside, *supra,* the trial court did not err in refusing to rule on Tandy's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, since it was divested of jurisdiction over the motions once the notice of appeal was filed.

Moreover, assuming, *arguendo,* that the trial court retained jurisdiction to rule on Tandy's motion and erred in refusing to do so, any error was harmless for the following reasons. In evaluating a motion for judgment notwithstanding the verdict, the same standard is used to resolve a motion for directed verdict, although unlike a motion for directed verdict made at the close of plaintiff's case, all of the evidence introduced at trial is considered. *Chem. Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 206–207, 556 N.E.2d 490, 493; *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 411, 504 N.E.2d 19, 20. For the same reasons specified in overruling appellant's fourth, seventh, and ninth assignments of error, appellant's similar arguments in its fifth, sixth, and eighth assignments of error are without merit.

Appellant's tenth assignment of error states that it was entitled to a judgment notwithstanding the verdict because there was no evidence of performance or a return promise, *i.e.,* consideration, from Ford. Tandy asserts that contrary to the terms set forth in Hartman's September 12, 1986 letter, Ford did not have a customer and Tandy did not obtain Republic's route at the quoted rate of $1,450. However, as previously specified, there was evidence of an offer from Tandy which did not completely depend on the letter. Appellee testified that Tandy's offer, which included subsequent verbal representations, was not contingent on Ford having Republic as a current customer or on Tandy acquiring the route at the $1,450 rate. Ford testified that the parties understood that the $1,450 figure was merely a starting point for negotiations and did not affect his $200 per load fee if Tandy was successful in obtaining the route.

Valuable consideration may consist of either a detriment to the promisee or a benefit to the promisor, and once consideration is shown, a court will not inquire into the adequacy of consideration except in cases of fraud or unfair treatment. *Software Clearing House, Inc. v. Intrak, Inc.* (1990), 66 Ohio App.3d 163, 175, 583 N.E.2d 1056, 1063; see, also, *Mooney v. Green* (1982), 4 Ohio App.3d 175, 4 OBR 276, 446 N.E.2d 1135. There was evidence indicating that Tandy

tendered the successful bid on the contract with Republic only because of information supplied by Ford and that obtaining the route substantially benefitted Tandy. Construing this evidence most strongly in Ford's favor, reasonable minds could reach different conclusions, and Tandy's motion for judgment notwithstanding the verdict is consequently without merit. Appellant's fifth, sixth, eighth, and tenth assignments of error are overruled.

Appellant's twelfth assignment of error asserts that the trial court erred in failing to rule on its motion for new trial on the ground that the evidence was insufficient to support the jury's finding that there was a manifestation of mutual assent. Tandy incorporates its previous arguments under its fourth, fifth, sixth, and seventh assignments of error. As noted previously, the trial court lacked jurisdiction to rule on Tandy's motion for new trial. *Powell, supra; Words, Inc., supra.* Moreover, there was sufficient evidence as a matter of law to support the jury verdict, and therefore no prejudicial error exists. Appellant's twelfth assignment of error is overruled.

Appellant's thirteenth assignment of error asserts that the trial court erred in granting Ford's motion for prejudgment interest because the amount sought by Ford was unliquidated. Prejudgment interest under R.C. 1343.03(A) is awarded from the time the amount at issue becomes "due and payable." *Miller v. Wilkel Mfg. Co.* (1989), 46 Ohio St.3d 76, 80, 545 N.E.2d 76, 80. Where money becomes due on a contract, interest accrues from the time the money should have been paid; however, where the amount due is unliquidated, the interest runs from the date of the judgment. *Allied Erecting & Dismantling Co. v. Auto Baling Co.* (1990), 69 Ohio App.3d 502, 506–507, 591 N.E.2d 259, 262. To avoid prejudgment interest, the debt must be unascertainable. *Finn v. Krumroy Constr. Co.* (1990), 68 Ohio App.3d 480, 490, 589 N.E.2d 58, 64. Moreover, prejudgment interest will not be denied, although the sum due is unliquidated, where the amount is capable of ascertainment by mere computation, or is subject to reasonably certain calculations. *Stephen's Jewelry, Inc. v. Admiral Ins. Co.* (1989), 63 Ohio App.3d 213, 216, 578 N.E.2d 520, 522.

Tandy claims that Ford was not entitled to prejudgment interest because Ford's testimony indicated that the contract could continue in perpetuity as long as Tandy continued to haul loads from Hanging Rock, Ohio to Republic's Dallas plant. However, the parties stipulated and presented as a "collective exhibit" the number of runs made by Tandy for this route. There was no evidence presented that other runs had been made by Tandy. Moreover, Tandy cites no authority for the proposition that the possibility of future runs by Tandy renders the amounts due for its previous breaches of the alleged contract unliquidated. Indeed, this would arguably imply that Tandy would continue breaching the contract despite a judgment upholding its existence and validity. In short, we

are persuaded that the amount due under the parties' contract was liquidated and that Ford was entitled to the prejudgment interest awarded by the trial court. Accordingly, for all of the foregoing reasons, appellant's thirteenth assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment Affirmed.*

STEPHENSON and GREY, JJ., concur.